# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 04 C 2703 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| CARMELO ZANFEI; WILLIAM P. CROUSE, | ) | |
| JR.; PARADIGM SOLUTIONS GROUP, LLC; | ) | |
| and SUPERIOR SOLUTIONS GROUP, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Sometime in late 1999 or early 2000, Carmelo Zanfei and William Crouse joined together to launch a series of business ventures. They began selling long distance phone service and then branched out into health insurance plans and medical reimbursement plans, the latter venture being the subject of this lawsuit. Along the way, they formed a number of companies of which they were co-owners but about which they now seem to know few details.

A few years later, they ran into legal troubles. In 2003, the Department of Labor filed a lawsuit in Indiana federal court accusing them of violating their fiduciary duties under ERISA by using employees' monthly health care premiums to take their families on European vacations, to buy expensive gifts, and to prop up some of their other ventures (including the one at issue here). The Indiana District Court granted summary judgment to the government and enjoined defendants from ever acting as an ERISA fiduciary again. *See Chao v. Crouse*, 346 F.Supp.2d 975 (S.D. Ind. 2004). Around this same time, defendants were pursued by the Insurance

Commissioners in Hawaii, Texas, Kentucky, Nebraska, Arkansas, Ohio, Missouri, Kansas, and Florida, who sought injunctions or cease and desist orders preventing defendants from selling health insurance. In 2005, defendants plead guilty to racketeering charges in Florida where they are now serving a prison sentence.

The government filed this action in 2004 because it concluded that, despite the injunction already entered by the Indiana court, Crouse and Zanfei have continue to sell abusive tax shelters. The government now moves for summary judgment, making two principal contentions. First, it asserts that defendants knew that the first of these plans (the HI Plan) was illegal because it advised employers that they could reduce employees' taxable income by reimbursing employees for the cost of employer-paid health insurance and then excluding those payments from wages. Second, the government asserts that the HI Plan and a second plan (the Healthier Plan) were intentionally designed and operated in a way that encouraged employees to seek reimbursements for expenses – such as swimming pools and home improvements – that were only reimbursable under limited and rare circumstances. The upshot, according to the government, is that these employers and their employees likely have filed incorrect tax returns.

Defendants deny these allegations and argue that they were acting within a well-accepted tradition, dating back to the Stamp Act, in which taxpayers legitimately seek to avoid taxes by going as close to the legal line as possible. Defendants point to the fact that they sought the advice of two accountants and an attorney and maintain that these plans were legal when they were sold and that, after the IRS definitively declared in January 2002 that reimbursements for health insurance premiums were not excludable from income, they stopped selling the HI Plan and only sold the Healthier Plan.

Although defendants strongly believe that the Healthier Plan is legal "in theory," they admit that it has had some flaws in administration. But they blame these problems on others – either the employers who were designated as plan administrators or on the employees who had the responsibility of keeping medical receipts or on the company that ran the processing center. Finally, defendants argue that an injunction is not need here because they already have been "rendered impotent" by the injunction entered by the Indiana court.

## BACKGROUND

Two preliminary points before summarizing the facts. First, for purposes of this summary judgment motion, there are no disputed material facts. This is because the defendants have not disputed most of the 96 facts contained in the government's Rule 56.1 statement and because, as to the small amount they did dispute, they have either cited to no evidence to support their position or have cited to documents that fail to support their claims. The government has accurately described these deficiencies in its reply brief, and we agree with them. For these reasons, we will rely heavily on the government's statement of facts and the documents cited in support of them. *See Federal Trade Comm'n v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.").[1]

---

[1]Defendants have not submitted a separate statement of facts as required by Rule 56.1, but they have submitted an affidavit from Crouse that contains some additional facts. Although this affidavit is not in strict compliance with Rule 56.1, we have also reviewed these facts and included those facts that were supported by admissible evidence.

Second, the factual record in some places is murky, making it hard to set forth a smooth summary of events. But this murkiness is not a reason for denying the government's motion because the facts that are known with certainty are by themselves sufficient to warrant the injunction and because, as discussed further below, this murkiness is primarily due to the casual way that defendants chose to run their businesses.

In the late 1990s, after working for other companies, Crouse and Zanfei began marketing and selling various products through a number of different companies that they created and generally co-owned as 50% shareholders. These companies included TRG Marketing; TRG Administration; The Redwood Group, LLC; defendant Paradigm Solutions Group, LLC; and defendant Superior Solutions Group, Inc. In this opinion, we will not attempt to keep careful track of each of these corporate entities for the simple reason that Crouse and Zanfei never did so in practice, operating them in a casual manner with fuzzy boundaries and little or no documentation or oversight. In their depositions, both men had trouble providing even rudimentary details about these entities. Zanfei was especially in the dark. With regard to defendant Paradigm, a company at the center of this lawsuit, Zanfei did not know or was uncertain about whether he was an officer, where the company was located, whether it had bank accounts, whether he was a signatory on any bank accounts, who did its tax returns, or even whether it filed any returns. For example, when asked whether he was an officer of Paradigm, Zanfei answered that he was a "manager." (Dep. at 61.) When asked whether he was a president, he first guessed that he was a "member" but then said that he didn't really know. (*Id.*) Although he received distributions from the company, albeit on a "sporadic" basis, he did not know who determined how much he got or how the determination was made. (*Id.* at 62.) To

provide another example of his generally hazy recollection, Zanfei testified early in his

deposition that one of his companies was TRG, LLC and that it was registered in Nevada (*id.* at

46), but later in the deposition, when he was asked what percentage interest he owned in this

company, said: "I don't know if there's a company called TRG, LLC." (*Id.* at 90.) He also

didn't know who owned Kuhlmann Enterprises but guessed maybe that Cindy Nordstrom "might

be" one of them. (*Id.* at 124.) These are not isolated examples. In sum, we concur in the

observation of the Indiana district court when it noted with regard to many of these same

companies that it is "difficult to conclude" where one starts and another stops, a problem that the

Indiana court blamed on defendants' "poor accounting practices." *Chao*, 346 F.Supp.2d at 984

n.3.

The HI Plan was developed by Zanfei before he met Crouse and was sold from 1999 until

sometime around early 2002 when the IRS issued a Revenue Ruling making it clear that the plan

was illegal. Defendants then modified this plan into the second one and called it the Healthier

Plan.

Zanfei and Crouse marketed these plans with the help of an accounting firm located in

Yankton, South Dakota. Members of this firm – Wohlenberg, Ritzman & Co., LLC ("WRC") –

attended an insurance seminar in Colorado and became interested in the HI Plan after hearing

Zanfei describe how it works. This eventually led to the formation of a long-term relationship

with the firm with Blaine Meier, who is a CPA and one of the firm's three owners, becoming the

primary contact person.

Although Meier did not attend the seminar, Zanfei later explained the HI Plan to him.

Meier's initial assessment was that the plan was aggressive because it did not provide clear

guidance in a few areas, the biggest one being "whether a certain type of medical expenses are reimbursable."

Nevertheless, on June 5, 2002, Meier's accounting firm entered into a formal agreement to provide technical and consulting services. (Meier Ex. 26.) The agreement provided that WRC would provide technical support that included preparing opinion lettters that the HI Plan was in compliance with the Internal Revenue Code and Treasury Regulations. The agreement also provided that the The Redwood Group would pay WRC a $2,500 retainer and $1 for each participant enrolled in the HI Plan. WRC would later enter into a similar agreement with Paradigm. (Meier Exs. 24, 25).

A week after this agreement was signed, Meier issued an opinion letter in which he concluded that the central objective of the HI Plan was legal – namely, he concluded that "the employee should be allowed to reduce taxable compensation by the amounts elected under the Salary Reduction Agreement and enjoy the intended benefit of paying health/medical insurance and eligible expenses with pre-tax dollars." The opinion letter did not disclose Meier's financial interest in the HI plan.[2]

On April 18, 2001, Zanfei obtained a second opinion letter for the HI Plan. This one was from Stuart Sobel, an accountant in Carmel, Indiana. (Ex. 6.) Sobel was more skeptical. His analysis was based on a review of both the relevant documents and Meier's opinion letter. For Sobel, the most controversial issue about the HI Plan was the reimbursement for the health insurance premiums as opposed to reimbursement of out-of-pocket health care expenses. *Id.* at 8. Although Sobel noted that a difference of opinion existed on the issue, he pointed out that the

---

[2]Zanfei had already been selling the HI Plan before he received this opinion letter.

prevailing opinion -- *i.e.* the opinion espoused by the "professional community, including CPAs and attorneys, who deal in tax matters" -- was that these premiums were *not* excludable. Sobel described these arguments as being "strong." (*Id.* at 8-9.) Translated in plainer terms, he thought that the central objective of the plan was most likely illegal.

At some point during this general time, Zanfei and Crouse also consulted with an attorney John Markham who helped them prepare one of the key documents in the administration of both of these plans. This was a two-page worksheet entitled "My Family's Health Expenses" that contains a list of possible reimbursable expenses and was given to all employees, along with a plastic bag to keep medical receipts. Employees were supposed to check off the box for each expense they incurred. The worksheet instructed as follows:

> Tracking your family's health expenses is easy! Simply (1) keep your receipts in a bag, (2) put an "X" beside each of your out-of-pocket expenses, (3) write the total amount of your expenses in the box (at the bottom of the other side of this form), (4) fill-in the beginning and ending dates of your Plan Year (for example "from 1/1/02 to 12/31/02"), (5) sign and date the form and, (6) give it to your Plan Administrator.

(Crouse Ex. B.) The specific expenses listed include things such as automobile modification, athletic shoes and athletic wear, socks, electrolysis, fees for memberships, fees for health clubs and programs, cotton swabs, specially equipped telephones, air conditioning, reclining chairs, other insurance, diapers, wipes, masks, AAA, tape, alcohol, shampoo, soaps, lotions, day care, tutoring, and swimming pools or spas "for treatment." Attorney Markham and the defendants developed this list after reviewing the annotated code of § 213(d) and related IRS revenue rulings. (Crouse Aff. ¶ 8.)

The way these plans were supposed to work is that the employer would collect these worksheets from each employee at year end and send them to defendants' "processing center"

(more on this below), which would then authenticate these expenses and send the employer a

year-end adjustment report.  It is unclear whether the employees were supposed to attach their

medical receipts to the worksheet.  The form of the worksheet attached to Crouse's affidavit

merely contains the instructions set forth above, which by negative implication do not require

receipts.[3]

## Marketing Of The Plans

Important to the legal analysis below is the question of how the plans were marketed and

specifically what representations were made in the written documents, promotional materials,

and oral statements.  The government has submitted affidavits, with attached documents, from

seven employer-clients.[4]  The plans were sold through The Redwood Group and later Paradigm

which developed written training materials and tested agents on their knowledge of these

materials.  A multi-level sales and commission structure was used to pay the agents.

The written documents are a mixture of formal legal documents designed to implement

the plan and promotional documents designed to sell them, the latter include brochures and

---

[3]This form was modified slightly at some point because the version later submitted by
employees contains these two (ambiguous) statements after the signature line:

[  ]    I will retain the receipts for medical expenditures in my possession.
[  ]    I have included my receipts for medical expenditures with this form.

(Sebastion Ex. B; *see also* Justice Ex. B; Troy Ex. A.).

[4]These employers are: (1) Servpro of Hartford County, Inc. ("Servpro") – declaration of
Louise Dion; (2) Clinton County Chapter of NYSARC, Inc. d/b/a Advocacy and Resource
Center ("ARC") – declaration from Theresa M. Garrow; (3) Northwestern School District in
Mellette, South Dakota – declaration of Diana Larson; (4) Brinkley, McNerney, Morgan,
Solomon & Tatum, LLP, Attorneys at Law – declaration of Toby Manke; (5) Metalcrafts
Incorporated – Declaration of Mary Ann Troy; (6) Aero Arc – Declaration of Nancy Justice; (7)
Kitchen Equipment and Supply Co. – Declaration of Rosalina Sebastian

Powerpoint presentations.  Again, due to the loose way in which defendants operated these companies and due to their failure to retain documents in any systematic way, we do not know the specific details regarding every individual client.  Nevertheless, we have sufficient information from these seven to discern defendants' general approach.  Moreover, defendants have not argued that any of the representations described by these companies are atypical.

With regard to the HI Plan, employers were given a collection of documents labeled the "HI Plan Administrator Kit."  *See*, *e.g.*, Dion Ex. A.  Various representations were made in this Kit.  Pertinent here, defendants made numerous promises to the effect that they would take care of all of the administrative aspects of the plan.  For example, the Kit states that The Redwood Group would perform, among other things, "On going reconciliation of Health Incentive Plan contributions," "Quarterly audits to ensure compliance with existing plan document," and "Adjudication of qualified medical expenses for employees."  (*Id.* at 6.)  The Kit also contained a section entitled "Frequently Asked Questions," one of which related to issue of medical expenses:

> **14.    Are there any medically related expenses that do not qualify?**
>
> Most medically related expenses do qualify.  If you have any
> doubts, submit the reimbursement voucher, TRG will inform you if
> the expense does not qualify.

(*Id.* at 9; emphasis in original.)  Notice that this statement refers to the fact that "TRG" will provide these services.  Another brochure advertised:

WE SET-UP AND ADMINISTER THE PLAN FOR YOU

(Garrow Ex. A 000140).  The "we" in this sentence is The Redwood Group.  *See id.*; *see also* Crouse Dep. Ex. 49 p. 6 ("We get expense authentication, so you don't have to." and "We do the

accounting, so you don't have to.").)  The brochure elsewhere promised that The Redwood

Group would provide "Turnkey administration," "Hassle-free implementation," and "Periodic

internal audits," among other things.  (Garrow Ex. A 000153.) It also touted the fact that the HI

Plan was based on "established" and "time-honored" IRS regulations and revenue rulings. (*Id.*

000139.)  The brochure listed the following reasons why an employer would need the services of

The Redwood Group:

- The establishment of a plan that is both ERISA and IRS compliant is not
  an easy or inexpensive task.

  – We have engaged uniquely qualified CPAs and ERISA attorneys.
  – Your plan is administered by highly trained personnel.
  – CPAs provide hands-on administrative oversight and technical support.
  – ERISA attorneys write your plan documents.
  – We handle the audit trail; you hold the money.
  – We effectively and appropriately communicate the plan to your
  employees.

(Garrow Ex. A 000153.)

### The 2002 Revenue Ruling Ends the HI Plan

In January 2002, the IRS published Revenue Ruling 2002-3, stating that reimbursements

for health insurance premiums were not excludable from wages because they were payments for

insurance premiums that had already been paid for by the employer and had already been

excluded from wages.

After this Ruling was issued (and arguably before then),[5] Crouse and Zanfei knew that

they had to modify the HI Plan.  They did so by eliminating the part relating to the excludability

of health insurance premiums from wages and by re-packaging the HI Plan under a new name,

---

[5]Zanfei became aware of Revenue Ruing 2002-3 in December 2001, when the IRS posted
it on its website shortly before it was formally issued.

calling it the Healthier Plan.[6]  They then engaged in a second round of marketing by contacting

every customer and giving them a new packet of information.  This packet, an example of which

is Dion Ex. E, contained an announcement dated February 4, 2002 and several Powerpoint slide

presentations to help employers understand the new changes.  The packet also indicated that

employers would be receiving "A CUSTOM SAVINGS GUARANTEE – *your written*

*guarantee of savings using the HI Plan*" and "A GUARANTEE AGAINST ADVERSE TAX

CONSEQUENCES – *the nothing-can-go-wrong, written guarantee*."  The Packet did not

acknowledge that the HI Plan as it had been administered was now illegal.  The slide

presentation was titled "Your HI Plan just got HealthIER" and stated, among other things, that

"We get expense authentication , so you don't have to."  The "we" again refers to The Redwood

Group.

### The Processing Center

As noted above, a key part of the plan was the processing center, which was supposed to

authenticate the medical expenses for employers and then send them a year-end adjustment

report.  For this service, defendants charged an administrative fee of $20 per employee.

The processing center was created by WRC and was called Kuhlmann Enterprises, LLC

("Kuhlmann").  The only full-time person working at Kuhlmann was Cynthia Nordstrom, who

was a daughter of one of WRC's partners who before then had been working for a temporary

staffing agency on the West Coast and who was interested in starting her own business.

(Nordstrom Dep. at 8-9.)  Kuhlmann's offices were located in the same building with WRC in

Yankton, South Dakota.  Kuhlmann entered into agreements with The Redwood Group and later

---

[6]This plan is sometimes spelled as the HealthIER Plan.

Paradigm to assist in the adminsitration and processing of the HI Plan, including "on-going HI Plan payroll medical reimbursement calculations and reporting requirements." (Nordstrom Ex. 13; *see also* Exs. 12, 14, & 15.) Under this agreement, Kuhlmann received a set dollar amount for each participant enrolled in the plans.

There is no dispute now that the processing center did not function as it was supposed to. It failed to provide authentication to the majority of the Healthier Plan customers. Of the 118 employers who participated in 2003, the processing center provided adjustment reports to 57 of them, or less than half. In 2004, the center provided adjustment reports to only 24% of the participating employers.[7]

For those employers who did receive adjustment reports, the center substantiated expenses for employees even though they provided no receipts to substantiate their claims. Specifically, of the 2,995 employees whose worksheets were processed for the year 2003, 1,526 or 51% provided no substantiation for their purported medical expenses for which they received "reimbursement" throughout the year. Of the 1,526 employees who provided some sort of substantiation for their medical reimbursements, 698 of them turned in forms with the supposed amount of their medical expenses equal to the penny to their purported reimbursement.

For example, in January 2003, Kitchen Equipment & Supply Company sent to the processing center several "My Family's Health Expense" forms that were signed and dated by employees but the amount of the employees' medical expenses was left blank. The processing

_____

[7]Defendants dispute these numbers by stating that the government's assertions are incorrect. However, because defendants fail to provide specific references to the places in the government's documents that support defendants' assertions and because defendants fail to offer any other documents to support their assertions, we must take the government's statement as true and unrebutted.

center simply treated those participants as having substantiated the entire amount of the reimbursement.

The processing center was given little guidance about what it was supposed to be doing. Defendants did not have any protocols or written procedures to assure that the center carried out its administrative responsibilities. Crouse never reviewed a family expense report, medical receipt, or reimbursement statement issued by the processing center. Defendants did nothing to assure that reimbursements were actually used for medical expenses. They gave the center no instructions on document retention or communications with customers.

Although defendants made no attempt to supervise or keep aware of what the processing center was doing and although they never provided any formal instructions, they did tell Nordstrom that the center should consider expenses as substantiated even though there were no receipts or other proof to justify them:

> We were told by, it was probably Carmelo – I don't recall whether it was Paul or Carmelo, that we were to just take the figures that were given to us on the forms, and then we would put that in the substantiation report that went back to the client. So we just took whatever figures were on the forms – provided the forms were signed – and then returned – and then put those on a substantiation report.

(Nordstrom Dep. at 40-41.)

### The Tax Consequences

The IRS performed employment tax audits of two related participants in the Healthier Plan: Southern California Sports Medicine and Orthopedic Group ("SCOI") and Center for Orthopedic Surgery, Inc. ("COSI") for the calendar year 2003. In 2003, SCOI had 226 employees who participated in the Healthier Plan and COSI had 25 and these two companies made total payments of $413,224.35 and $42,691.93, respectively, to its employees as purported

medical expense reimbursements under the Healthier Plan. Those amounts were improperly excluded from wages on the employees' Forms W-2, and were improperly excluded from wages for purposes of calculating employment taxes on SCOI's and COSI's quarterly forms 941.[8]

The IRS determined that SCOI and COSI underreported their employment taxes on Form 941 returns for all quarters of 2003 by the total amount of $178,355.62 and $18,485.62, respectively. These adjustments are solely due to their participation in the Healthier Plan. COSI and SCOI have agreed to the IRS's determination that the purported medical expense reimbursements they paid their employees under the Healthier Plan were taxable wages for income and employment tax purposes. They are now required to issue Forms W2-C to their employees for the year 2003 to correct the understatement of wages on their previous Forms W-2. The IRS also advised COSI and SCOI that all of their employees should file amended income tax returns for the year 2003 to correctly report their wages. In addition to COSI and SCOI, defendants had hundreds of other customers who underreported their Form 941 taxes to the IRS while participating in the HI Plan or the Healthier Plan.

## ANALYSIS

The government argues that an injunction may be issued pursuant to either of two IRS Code sections. Section 7402(a) of the Internal Revenue Code provides that federal courts may issue injunctions "to enforce tax laws." *United States v. Raymond*, 228 F.3d 804, 809 (7th Cir.

---

[8]Defendants claim that SCOI improperly modified the Healthier Plan so that any adverse tax consequence was not caused by the Healthier Plan. However, defendants have failed to provide any support for this assertion other than the Crouse's affidavit. Given that he has not shown how he would have been able to know about any alleged modifications done unilaterally by SCOI and given that he has failed to offer any other documentary evidence to suggest such modifications were made, he has not created a factual dispute under Rule 56.

2000) (describing this section as a "broad grant of power"). According to the government, this section does not require that the government show that the defendants violated any particular section of the Internal Revenue Code.

Although the government briefly discusses § 7402(a), the parties focus their attention almost exclusively on Section 7408, and we will therefore do the same. Under this section, the government must show that defendants have (1) engaged in any conduct subject to a penalty under § 6700 and (2) injunctive relief is "appropriate to prevent recurrence of such conduct." *Id.* at 811.

### A. Section 6700.

Section 6700 is entitled "Promoting abusive tax shelters" and applies to any person who organizes or participates in any "plan or arrangement" and who makes (or causes another person to make) a "statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter." 26 U.S.C. § 6700(a). There is no dispute that the two plans at issue here constitute a "plan or arrangement" as defined by this statute. In dispute is whether defendants made a false or fraudulent statement and whether they knew or had reason to know that the statements were false or fraudulent.

In assessing whether a particular statement is false or fraudulent within the meaning of this statute, we have relied on *United States v. Gleason*, 432 F.3d 678 (6th Cir. 2005) because it is a recent case with a similar fact pattern and because it contains a good discussion of these standards. In *Gleason*, the Sixth Circuit affirmed the entry of a permanent injunction against a

tax preparer (Gleason) who was selling a Tax Toolkit designed to convert expenses around the home into business expenses. The Sixth Circuit found that Gleason's promotional statements and promises were false or fraudulent statements under § 6700 primarily because he did not "qualify his assertions" and because he "failed to warn" his customers that following his advice might cause them to be scrutinized by the IRS. *Id.* at 682-83 ("Mr. Gleason did not properly qualify his assertions about the deductibility of weddings, college, travel, meals, golf, cars, and everyday household expenses by stating that business expenses must be 'ordinary and necessary' to the business, and that personal consumption expenditures must be 'inextricably linked to the production of income.'") (internal citations omitted). The fact that Gleason did refer in his marketing materials to some IRS publications was not a defense because he failed to cite to *other* IRS publications that warned about the type of deductions he was advocating. And his promise that his tax methods were "audit proof" was a claim that no tax plan could make. *Id.* at 683. As explained below, we find that *Gleason* is factually similar and provides a good model for analyzing this case.

We now turn to the government's arguments. As noted previously, the government has two main criticisms regarding these plans. The first is that the HI Plan advised employers that reimbursements for employer-paid insurance could be excluded from income. Defendants concede that during the time this plan was sold (*i.e.* before the January 2002 Revenue Ruling) this was an "open question." But they argue that it was not until the Revenue Ruling was issued that the answer became clear at which point they stopped selling the plan. The government's position is essentially that defendants were very aggressive in their interpretation of existing regulations. The Sobel opinion letter certainly informed them in strong terms that the central

feature of the HI Plan likely would be considered illegal. But we do not find that it is necessary in this opinion to answer whether defendants' representation regarding this aspect of the HI Plan was an aggressive but good faith representation or whether it stepped over the statutory line. This is because, as set forth below, the evidence is undisputed and clear that defendants knowingly made a number of other false or fraudulent statements that are sufficient to support the requested injunction.

The government's second criticism is that defendants set up these plans in such a way as to give employers and their employees "carte blanche . . . to report anything as a medical expense." More specifically, the government alleges that defendants first created a worksheet (My Family's Health Expenses) that included an "extremely expansive definition" of what constituted reimbursable expenses under the plans; that defendants' sales agents then made oral statements further reinforcing this impression; and finally that defendants created an illusory verification system consisting of a processing center that made no more than "token efforts" at substantiating medical expenses. (Gov. Mem. at 21.)

Before addressing this second criticism, we first note that the government has also identified several other allegedly false statements. First, the government asserts that defendants falsely represented to employers that the amounts paid out to employees under the Healthier Plan for which employees never obtained reimbursement need not be reported as wages in the year of payment. Second, the government asserts that defendants falsely represented to employers that the administrative fees of $20 per employee per month, which were deducted from employees' paychecks, were properly excluded from wages reported on W-2 forms. Third, defendants gave employers a savings guarantee promising that employers would save a certain amount of money.

*See Gleason*, 432 F.3d at 683 (a claim that a tax method is "audit-proof" is misleading because "no tax arrangement is immune from IRS scrutiny"). In their response brief, defendants do not address the government's assertions that these three representations are false or fraudulent. These misrepresentations by themselves are significant in this Court's opinion.

We now turn to the government's second main criticism, which is that the overall structure and operation of the plans were flawed. Defendants respond with several different arguments. They argue that the worksheet was accurate; that employees were not required to substantiate their medical expenses under IRS regulations; that, even if they were, defendants "made every effort to make employees document their expenses" (Resp. 14); that defendants did not serve as plan administrators; and that defendants contracted out the administrative aspect of the plans to third parties "who had more experience in dealing with areas of tax law" (Resp. at 14-15.) As set forth below, these arguments are unavailing as they either lack any factual support or are beside the point.

With regard to the worksheet, defendants emphasize that they consulted an attorney who in turn analyzed and relied upon federal regulations and other authorities. Defendants thus believe that as long as they had some authority for listing a particular item as a possible reimbursable expense on the worksheet, then it was not misleading to list that item on the worksheet. Defendants further argue that it is impossible now to tell whether some of the items on the list are deductible because these types of questions cannot be answered in the abstract but instead are fact intensive questions, which defendants then believe constitute Rule 56 fact disputes. As an example, defendants point in their response to the entry for "Swimming Pool or

Spa for Treatment" and note that there are two inconsistent tax court decisions on whether this expense is deductible.

The problem with this argument is that the worksheet contains no warnings or qualifications and specifically no explanation of this very point. No hint is given to the employee checking off this box that he will be entering a grey area where there are conflicting legal opinions. While the worksheet contains a few phrases here and there referring to the need for a prescription or that an item is "medically necessary," the worksheet does not contain any guidance about what these vague phrases mean or more generally provide any explanation about why an expense is legally deductible. The Sixth Circuit in *Gleason* concluded that this type of unqualified representation without any countervailing warning or contextual explanation violates § 6700.

But the worksheet's overly expansive definitions and its lack of any explanation or warnings were only the first part of the problem. Further reinforcing the initial impression that almost any expense arguably related to healthcare was reimbursable were statements made by sales' agents. For example, one agent told employees that "any expense that could be considered for 'self betterment' could be used for substantiation." (Justice Aff. at ¶ 4.) Moreover, the standard script that was allegedly used by defendants' sales agents gave the following advice about what may be deductible:

> I know this may sound a little extreme, but just think about it. Did you buy band-aids, acne cream, vitamins, dandruff shampoo or **anything** of the sort, when you went to the grocery store? Did you pay cash for the co-pay at the doctor's office? Did you get a **receipt**? What did you do with it? How far **is** it to the doctor's office, anyway? The mileage **is** deductible. Did you have to install something in your home or modify your house [or] car because of some diagnosed condition? And this is just the **beginning**. I'm sure you can think of more. If, in your mind,

[] any expense that is in **any**way related to **wellness or getting well**, a **sickness**, an **accident** or an **impairment**, then [it's] probably deductible.

(Crouse Ex. D. p. 6; emphasis in original).[9]  As with the worksheet, this statement contains broad and aggressive descriptions about what may be deductible (such as "any expense that is in **any**way related to . . ." and "this is just the **beginning**") and at the same time fails to provide any warnings or qualification.  *See Gleason*, 432 F.3d at 685 ("Mr. Gleason systematically overstated the tax benefits of a home-based business without warning of well-established limitations in the tax code.").

Defendants place great weight on the fact that they periodically told employees to keep medical receipts.  As an initial matter, it is not entirely clear how consistent this advice was.  It is true that the worksheet and the script referred to above advised employees to keep medical receipts and also true that defendants even provided plastic bags to some employees to put receipts in.  But the government has submitted evidence of what agents actually said in the field and some of them veered off the script.  One agent told employees that "they did not have to save medical receipts for the reimbursements, but that they could if they wanted."  (Garrow Aff. ¶ 5.)

But even if we assume that all agents consistently told employees to keep receipts, there is still the problem that these agents told employees in the same breath that they would not need to turn in those receipts.  The government has provided undisputed evidence on this point.  One agent, for example, told employees that "they should save their medical receipts each year but they did not have to turn them in."  (Manke Aff. ¶ 5.)  Another agent told employees that they

---

[9]This document was submitted to the Court by defendants and described by them as an "excellent example of exactly what the employees were being told."  (Resp. 3.)

did not have to turn in receipts and all that they needed to do was to sign, date, and enter a dollar amount on the worksheet.  (Justice Aff. ¶ 5.)  Moreover, the worksheet itself did not instruct employees to turn in receipts; instead it merely contained two check boxes at the end giving employees the option of turning in receipts or keeping them.  By giving an employees an option of *not* turning in receipts, defendants were effectively telling them that they did not have to turn them in.

And the general advice to keep receipts by itself does not help employees answer the underlying question of which expenses are reimbursable in the first place.  This is where the processing center was supposed to come in.  Employees would turn in their receipts so that the processing center could determine whether the expenses were deductible.  This process of authentication was heavily touted by defendants' in their marketing materials and was a key part of why they charged $20 per employee.  But the undisputed evidence summarized in the background section above demonstrates that the processing center in practice engaged in a meaningless exercise in shuffling paper back and forth.  The center substantiated expenses even though it had no basis for doing so.  It did not matter whether the worksheets included any receipts.  As Nordstrom explained in her deposition, "[t]he employee had the option of whether or not they were going to [] keep their receipts or turn [them] in."  (Nordstrom Dep. 36.)  No questions were raised about the legitimacy of any expense.  About the only thing done was to look and see if the employee signed the form, as Nordstrom stated that she rejected a few worksheets because there was no signature.  This was all done pursuant to the direct advice of Crouse and Zanfei.  Moreover, no effort was made to make sure that employers were even sending in worksheets.

Defendants have conceded this point, at least indirectly, by acknowledging in general terms that there were "flaws" in the administration of the plans.  (Resp. 15.)  Defendants believe, however, that these administrative  problems were not their fault or responsibility.  In his affidavit, Crouse stated:  "Carmelo Zanfei and I do not service any HI Plan/HealthIER Plans." (Aff. ¶ 3.)  When asked in his deposition what efforts he made to make sure that the processing center was doing its job, he said "nothing."  (Crouse Dep. 169.)   Defendants instead claim that the problems should be blamed on the employers who were technically the "plan administrators" and on the processing center, which defendants now portray as an unrelated third party.

This defense is defective in several different ways.  Although the processing center was formed by WRC and operated in the same building, there is no evidence that anyone from WRC actively supervised the operation.  Nor is there any evidence that defendants instructed WRC on how the processing center should work.  Instead, Cynthia Nordstrom, who was the primary employee there, testified that she would call Zanfei and Crouse when she had questions.  *See* Nordstrom Dep. 17 ("basically when I came on [to Kuhlmann] it was all oral instructions . . . from Carmelo").  As noted previously, on the important question of whether to authenticate worksheets that failed to include any receipts, Nordstrom testified that she was told directly by either Crouse of Zanfei that receipts were not needed.  Karen Langley, who sometimes worked in the processing center along with Nordstrom, testified that any questions by employers participating in the plans were "*always* referred to . . . Mr. Zanfei and Mr. Crouse."  (Langley Dep. 25; emphasis added).  In sum, to the extent that the processing center was given any instructions, they came from Crouse and Zanfei.

Moreover, although Kuhlmann was a separate corporation owned by WRC, defendants did not make this point clear in their marketing materials. These materials often referred to the "processing center." One document referred to it as the "TRG Processing Center." (Dion Ex. C, p.4 of HI Plan Agreement for Services.) Another used the generic label "Processing Center" but included the Paradigm logo next to it. (Larson Ex. B.) Consistent with their overall style of corporate governance, defendants did not maintain any clear or consistent distinctions between the processing center and their various corporate entities.

Most importantly, although defendants now maintain that it was not their job to oversee the administration of the plans, they consistently told employers just the opposite. They promised employers that *they* (*i.e.* Redwood or Paradigm or TRG) would take care of the administrative aspects of the plans. We have already summarized these representations above, but they included the claim that defendants would set up and administer the plans and that it would be "hassle-free" and a "turnkey administration." They said that these tasks would be administered by "highly trained personnel." Defendants also touted the fact that expenses would be authenticated. They gave assurances to employers about whether certain medical expenses were reimbursable by firstly stating that "most medically related expenses" do qualify and then by secondly promising: "If you have any doubts, submit the reimbursement voucher, TRG will inform you if the expense does not qualify." Again, it states that "TRG" is the party doing the verification, not Kuhlmann. Given these representations and promises, it is thus irrelevant

whether (as defendants argue) employees were supposedly not required by law to provide the receipts or likewise whether employers were the legal plan administrators.[10]

Defendants also argue that, even if their statements were false, they were not made knowingly. Courts analyzing the "knew or had reason to know" standard typically examine the following factors: (1) the extent to which defendants relied on knowledgeable professionals; (2) defendants' sophistication and education; and (3) defendants' familiarity with tax matters. *United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1103 (9th Cir. 2000). Relying on this standard, defendants argue that they reasonably relied on the opinion letters of two accountants (Meier and Sobel) and one attorney (Markham).

In response, the government argues that Meier's opinion must be discounted because he had a financial interest in the plans and thus had an incentive to find them legal. On this point, we agree with the government and the cases cited in support. Moreover, neither Meier nor Sobel reviewed the administrative operation behind these plans. Their opinions therefore would provide no support for those representations relating to the comprehensive nature of the administrative services that were promised. The disparity between what defendants promised they would do for customers (*i.e.* a "turnkey administration") and what they actually did for them

---

[10]We suspect that the above-described misrepresentations are not the only ones. For example, in reading the defendants' promotional materials, we note that they told potential customers that The Redwood Group was a well-established business that had been providing health care services since 1991. *See* Dion Ex. A, p. 3. Yet, in their depositions, Zanfei and Crouse stated that they only began working together sometime around 1999 and that they formed these companies (including The Redwood Group) in 1999 and 2000. *See, e.g.,* Crouse Dep. 18-20.

(nothing) is so stark and existed over such a long period that defendants could not have believed in good faith that these representations were true when made.

**B.    Is An Injunction Appropriate To Prevent A Recurrence?**

The second part of the test under § 7408 is the likelihood of recurrence, which requires this Court to look at the "totality of circumstances surrounding the [defendants] and their violation of the law." *Raymond*, 228 F.3d at 813. The factors that may be looked at are: (1) the gravity of harm; (2) defendants' participation and degree of scienter; (3) whether it was an isolated or recurrent infraction and whether defendants' customary activities might again involve them in a similar transaction; (4) defendants' recognition of their culpability; and (5) the sincerity of their assurances against future violations. *Id.* (citing to *Kaun*, 827 F.2d at 1149-50). In *Raymond*, the Seventh Circuit concluded that the behavior was not isolated because the defendants attempted to sell their program to "at least 55 individuals over a six month period." *Id.* at 814.

Here, the defendants had over 250 customers and made the same false or fraudulent statements numerous times. This is not isolated behavior. At the time this lawsuit was filed, defendants were continuing to sell these plans through a website operated by Superior Solutions Group, LLC. Defendants also have not accepted responsibility for these problems and instead, as discussed above, have attempted to place the blame on a processing center that was ill-prepared but nonetheless received direct instruction from defendants. The problems of administration in this case were not isolated slip-ups but were recurrent and structural, the product of a system which the defendants created, advertised, and vouched for, but which defendants then ignored.

Defendants also argue that they were merely going up to the legal line without stepping over.  Yet, it is undisputed based on the Indiana case, the state injunctions, and the Florida criminal case, that defendants have repeatedly fallen over this line.  Their history provides no basis for believing that they have either the knowledge or the willingness to step carefully around any such line.  Similarly defendants' argument that the Indiana injunction is sufficient is not persuasive.  This argument, of course, concedes the central point of the government's lawsuit here -- namely, that the defendants cannot be trusted.  To the extent that there is any overlap or duplication, it will not result in any harm.  Defendants finally argue, in an apparent act of altruism, that even if they are culpable for the way the plans were run, the plans themselves were not illegal in theory and should not be punished for defendants' failure to administer them.  The answer to this final argument is that the injunction being sought in this case is against Crouse and Zanfei and their wholly-owned companies and not against the plan itself.

## CONCLUSION

For the reasons set forth above, the government's motion for a summary judgment is granted. Although the government has not submitted a proposed injunction order that would comply with the requirements of Rule 65, it has set forth the specific language of the proposed injunction in the 5-page motion that accompanied its brief. Defendants have never objected to the specific details set forth therein nor proposed any modifications or changes thereto. The government therefore shall submit to this Court and the defendants a proposed order in a form compliant with Rule 65 for this Court to sign. This Order should be submitted within 28 days of the date of this memorandum opinion. The Court shall then set a final hearing date, with notice to the parties, to enter the injunction order.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED: September 29, 2006**